NOTICE
Decision filed 04/23/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240306-U

NO. 5-24-0306

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 21-CF-891 |
| | ) | |
| KEVIN D. FINLEY, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Moore and Boie concurred in the judgment.*

**ORDER**

¶ 1    *Held*: Defense counsel's failure to move for suppression of defendant's statements was not deficient performance where defendant did not unambiguously and unequivocally invoke his right to remain silent. Defendant was not prejudiced by defense counsel's failure to move to suppress or exclude his refusal to provide a buccal swab where there is no reasonable probability the result of the proceedings would have been different had the evidence been excluded. Plain error review of defendant's forfeited claims was not warranted where the record demonstrated no error in prosecutor's closing arguments; alternatively, defense counsel was not ineffective for failing to object to prosecutor's statements. The trial court's improper consideration of unverified hearsay evidence during sentencing requires remand for a new sentencing hearing.

_____

*Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

¶ 2     The defendant, Kevin D. Finley, was convicted of aggravated criminal sexual assault with a dangerous weapon (720 ILCS 5/11-1.30(a)(1) (West 2020)) and aggravated criminal sexual abuse (*id.* § 11-1.60(a)(1)). The trial court sentenced the defendant to 35 years in the Illinois Department of Corrections for the aggravated criminal sexual assault conviction plus a mandatory supervised release (MSR) term of 3 years to life and a consecutive prison sentence of 10 years for the aggravated criminal sexual abuse conviction. On appeal, the defendant argues that he received ineffective assistance where defense counsel failed to move to suppress his custodial statements in violation of his fifth amendment right to silence; failed to move to suppress or exclude his refusal to provide a buccal swab in violation of his fourth amendment right to refuse a pre-warrant request for a buccal swab; and failed to protect his due process right to challenge a buccal swab order after notice and opportunity to be heard. He also argues that the prosecutor's statements during closing arguments constituted plain error and that defense counsel was ineffective for failing to object to the prosecutor's statements. Finally, the defendant argues that the trial court's improper consideration of unverified hearsay evidence during sentencing constituted first-prong plain error. For the reasons that follow, we affirm the defendant's convictions, vacate the sentence, and remand for a new sentencing hearing.

¶ 3                                  I. BACKGROUND

¶ 4     In the early morning hours of July 8, 2021, Y.W. called 911 to report a sexual assault. The defendant became a person of interest in the investigation. On July 10, 2021, police conducted a traffic stop of the defendant, and he was taken to the police station for questioning. The defendant refused to provide a DNA sample through a buccal swab. As the defendant was not under arrest, he was allowed to leave.

2

¶ 5    On July 16, 2021, police obtained a search warrant for the defendant's residence, truck, and for a buccal swab. When police attempted to serve the warrant, the defendant refused to submit to the buccal swab. The State filed an indirect criminal contempt case against the defendant in case No. 21-CF-14 for his refusal to comply with the search warrant.

¶ 6    On July 30, 2021, the State filed an information charging the defendant with aggravated criminal sexual assault while armed with a firearm (*id.* § 11-1.30(a)(8)), aggravated criminal sexual assault while displaying a dangerous weapon (*id.* § 11-1.30(a)(1)), and aggravated criminal sexual abuse while displaying a dangerous weapon (*id.* § 11-1.60(a)(1)).

¶ 7    As of August 10, 2021, the defendant still had not complied with the search warrant in case No. 21-CF-14. The State filed a motion for discovery pursuant to Illinois Supreme Court Rule 413 in the instant case requesting the trial court to order the defendant to submit to the taking of his fingerprints and DNA samples. Ill. S. Ct. R. 413 (eff. July 1, 1982). At the preliminary hearing in the instant case held on August 11, 2021, the trial court granted the State's discovery motion, and an officer was allowed to collect the buccal swab in the courtroom in the presence of defense counsel. The State moved to dismiss the indirect criminal contempt case against the defendant in case No. 21-CF-14.

¶ 8    At a pretrial hearing held on October 7, 2022, defense counsel informed the trial court that the defendant wanted her to file several motions, including a motion to suppress the victim's testimony, a motion to suppress the video evidence, a motion to suppress the detective's statements, a motion to suppress his initial arrest, and a motion to challenge the DNA testing. The defendant had indicated to her that he wanted a different attorney. Defense counsel informed the trial court that she did not believe there was a legal basis to support the filing of the motions. The trial court explained to the defendant that he had been appointed a public defender but that he could

3

hire his own attorney. The defendant indicated he had spoken with another attorney, but he was waiting to see if his family could provide the money to hire the attorney. The trial court continued the hearing until early January 2023 to give the defendant time to hire his own attorney.

¶ 9    On October 21, 2022, defense counsel filed a motion *in limine* seeking to preclude the State from introducing evidence of the defendant's prior drug convictions at trial. On November 9, 2022, the defendant filed a *pro se* motion for an evidentiary hearing. As the defendant was still represented by the public defender at that time, the trial court declined to consider the motion. At a pretrial hearing held on January 3, 2023, the defendant informed the trial court that he intended to proceed with the public defender, and the matter was set for trial.

¶ 10    Prior to trial, the parties stipulated to the admission of surveillance videos from the Champaign-Urbana Mass Transit buses, Carle Hospital, and a residence at 412 East Fairlawn in Urbana, each having a video recording system that recorded events from July 7 and July 8, 2021. These recordings were provided to law enforcement and admitted into evidence as People's Exhibits 18, 19, and 20.

¶ 11                        A. The State's Case

¶ 12    At trial, Y.W. testified that in July 2021, she was a PhD student at the University of Illinois in Urbana where she resided in a two-bedroom, ground floor apartment. She and a roommate had separate bedrooms and bathrooms. On the evening of July 7, 2021, Y.W. fell asleep alone in her bedroom. At approximately 2 a.m. on July 8, 2021, she awoke to a dark room and a cold, hard object touching her face. Y.W. was on her back when she heard an unknown male voice say, "If you move, I'll shoot you." Although she thought she felt a gun, she never saw a gun. The man told her to "turn around," and she complied. The man took off her pajama pants and underwear. As she complied with the man's instructions, she thought she heard the sound of a condom wrapper being

4

torn. She testified that "he rubbed something on my vagina" before his penis entered her vagina for a few minutes.

¶ 13    After the man removed his penis, he checked Y.W.'s iPhone 7 that was on her bed. The man told her to take a shower. She went into the bathroom and took a shower with the curtain closed while he left the bathroom. She tried not to clean herself thoroughly to preserve evidence. After Y.W. showered, she put on a towel, and the man returned to the bathroom. He used a light strapped to his head to inspect her vagina. After he inspected her, he left through the sliding glass door. The man was in Y.W.'s apartment for several minutes. At trial, Y.W. did not identify the assailant. She described him as a black male with a heavy build and short black hair.

¶ 14    The State introduced, over defense counsel's objection, two 10-second recordings from Y.W.'s iPhone's Sleep Cycle app, which can record sound. On the first recording, a male voice could be heard saying, "If you yell, I'm gonna shoot you. If you move, I'm gonna shoot you. Turn over." On the second recording, a male voice said, "Turn over or I'm gonna shoot you." Detective Kenneth Sprague, who interviewed the defendant on two separate occasions and had listened to approximately 90 jail phone calls made by the defendant lasting from 12 to 20 minutes each, opined that the voice on the audio clips belonged to the defendant.

¶ 15    After the man left, Y.W. called 911 and the police arrived. Police Sergeant Matthew McKinney was one of first responding officers and saw a yellow cloth covering the patio light. A sliding glass door separated the patio and Y.W.'s bedroom. Y.W. stated she had not put the cloth on the outside light. Sergeant McKinney spoke with Y.W.'s nearby neighbor James Hooper, who lived in an apartment on South Vine Street. Hooper told the sergeant that over the past few weeks, he saw a suspicious man in the area. Sergeant McKinney testified that Hooper's description of the man was similar to Y.W.'s description of her assailant.

5

¶ 16    Detective Sprague testified that when he spoke with Hooper, he described a man similar to Y.W.'s description of the offender. Detective Sprague created a photographic lineup that included the defendant's photo. University of Illinois police officer Cecil Moore showed the lineup to Hooper, and Hooper selected a photograph of Anthony L. Blissit, who was known to law enforcement. Detective Sprague believed that Hooper mistakenly selected Blissit because Blissit lived on the far west side of Champaign. According to the detective, Blissit had no police contacts in the Urbana area where the sexual assault had occurred. Detective Sprague did not believe that there would be probable cause to obtain a search warrant for Blissit's residence, vehicle, or DNA.

¶ 17    On July 8, 2021, Detective Sprague met Y.W. at the hospital and collected her underwear as evidence. He placed the underwear in a sealed evidence bag. At the hospital, nurse Lindsey Ogle conducted a sexual assault examination of Y.W. and collected evidence for a sexual assault kit. The collected swabs and samples included a buccal swab from Y.W.'s cheek, a cervix swab, a vaginal swab, pubic hair combings, and miscellaneous debris of material from around the combings. Y.W. also explained how the assault occurred. Ogle saw no signs of physical injury, which she testified was not unusual. Ogle observed that Y.W. appeared shaken up.

¶ 18    On July 8, 2021, Illinois State Police (ISP) criminal scene investigator Erin Bowers arrived at Y.W.'s residence, took photographs, and collected evidence. Bowers did not find any usable latent prints. She swabbed Y.W.'s phone for DNA and took photographs of shoeprints on the bedroom's wooden floor. The footprint photos featured imprints with several concentric circles. Bowers used gel lifts to capture four footprint impressions.

¶ 19    On July 16, 2021, Detective Sprague and Urbana police went to the defendant's residence after obtaining search warrants for his residence, truck, and for a buccal swab. When they arrived, Detective Sprague saw the defendant and two people enter a car and drive away. Urbana police

6

officers stopped the vehicle, and the defendant was taken to the police station where Detective Sprague and Detective McCartney[1] conducted the recorded interview of the defendant. When the officers executed the search warrant of the defendant's residence, they found a pair of black Air Force 1 shoes in size 11. Detective Sprague testified that the shoe's tread pattern was consistent with the shoeprints from Y.W.'s bedroom. The police did not find Y.W.'s underwear or pajama bottoms at the defendant's residence.

¶ 20 On August 8, 2021, Detective Sprague obtained a DNA elimination standard from Y.W.'s boyfriend. On August 11, 2021, Detective Sprague collected a buccal swab from the defendant while his attorney was present. ISP forensic scientist Sangeetha Srinivasan could not make any conclusive findings when she attempted to conduct quantitative PCR-DNA testing on a yellow towel, a light bulb, a cell phone, the swabs collected from the sexual assault box, and a pair of Y.W.'s underwear. Srinivasan concluded that a cervix swab and the vaginal swab were unsuitable for PCR-DNA analysis because the amount of male DNA present was very low when compared to the amount of female DNA. Srinivasan processed items for Y-STR DNA which were analyzed by ISP forensic scientist Jennifer Aper.

¶ 21 Aper testified that Y-STR analysis is a common procedure for situations when male DNA may be overpowered by other DNA. Y-STR analysis targets the Y chromosome, which is found only in male DNA. Aper conducted Y-STR analysis on four vaginal swabs and was unable to get conclusive results for three of the four samples. Aper testified that on a third vaginal swab sample, she observed Y-STR haplotype on 16 of 23 areas. Aper compared the sample to samples from the defendant and the elimination standard from Y.W.'s boyfriend.

---

[1]The record does not reveal Detective McCartney's first name, and he did not testify at trial.

¶ 22     Regarding the third vaginal swab, Aper stated the defendant was a "possible contributor" while the elimination standard was eliminated as a possible contributor. Aper explained that the 16-locus Y-STR haplotype could occur in 1 of 2,800 unrelated white males, 1 of 2,300 unrelated black males, and 1 of 2,000 unrelated Hispanic makes. Aper explained that during Y-STR testing, she "never see[s] a profile or Y-STR haplotype more rare than one in 2,800 in the population." Aper testified she could not conclude that the defendant was a DNA contributor because the DNA frequency can commonly occur within a population, but she could not exclude the defendant or his male relatives as possible contributors.

¶ 23     At trial, the State presented an edited version of the police interview conducted by Detective Sprague and Officer Ingram[2] on July 10, 2021. At the start of the interview, Detective Sprague administered *Miranda* warnings. During the interview, the defendant said he lived in Urbana. He was at Carle Hospital on July 7, 2021, because his girlfriend had a baby. The defendant stated he left the hospital around 10 p.m. or 11 p.m. to run errands and returned home. He later returned to the hospital. The defendant stated he knew some people who lived on Vine Street across the street from the middle school, but he did not want to give any names. One of the friends lived in a brown apartment building located at 906 South Vine Street, and three other friends lived in a white house located at 910 South Vine Street. He told the detectives that if he was in the Vine Street area on July 7, he was checking on his friends.

¶ 24     Detective Sprague remarked that the defendant's shoes, which were white sneakers with some red on them, looked cool and that he had a "big ass foot." The defendant stated his shoe size was a "10." The detective also asked the defendant about a "unique" walk or swagger. The defendant explained that he suffered a football injury when he was 10 years old that resulted in

---

[2]The record does not reveal Officer Ingram's first name, and he did not testify at trial.

8

surgery to his left knee. The defendant denied having sex with anyone on July 7. The defendant denied knowing Y.W. or anyone with Y.W.'s last name. During the videotaped interview, which was later shown to the jury without objection, Detective Sprague asked to perform a DNA sample while holding a buccal swab kit and the defendant declined. The detective told the defendant, "That is your choice." The defendant was not under arrest and was allowed to leave.

¶ 25 Now-retired ISP forensic scientist Lindall Moore compared the four gel lifts of shoeprints to the Air Force 1 shoes. He used a computer to place the four gel lift photos next to photos of the bottom of the shoes. Moore opined that some of the gel lifts could have come from either the right or left shoe based on each shoe's respective pattern designs while also testifying that he was unable to determine whether the recovered shoes were the only source of the impressions. Moore could not make a conclusion because the fairly new shoes lacked any identifying characteristics such as a scratch.

¶ 26 At trial, without objection, the State published an edited version of the police interview conducted on July 16, 2021, to the jury. The video started with the detectives showing the defendant a court order for a buccal swab and the defendant refusing to provide a sample. The handcuffed defendant told the detectives:

"I'm not trying to partake in none of that that y'all got going on. I'm not on that—
Y'all are just violating my rights were oppressing me with things that y'all got going on and whatever you said, OK, then we need to go to the next step, bro, cause I am not cooperating when you say we signing. No, I'm not doing no fingerprinting in the county. I'm not doing nothing to do with your corporation [*sic*], bro. That's what I'm trying to—"

¶ 27 The detective interrupted him and urged him to comply with the order, explaining to the defendant that he could be held in contempt. The defendant responded that the detectives and the

judge who issued the order were violating his rights. Detective McCartney warned of contempt proceedings and the defendant replied, "That's OK."

¶ 28    Detective Sprague asked the defendant to show him his text messages and brought the defendant's phone into the interview room. The defendant showed his text messages from 9:57 to 11:19 p.m. With Detective Sprague holding a map, the defendant described his location throughout the evening. Detective Sprague told the defendant the police had obtained video from a mass transit bus of a man near Y.W.'s apartment wearing Air Force 1 shoes at approximately 10:40 p.m. on the night of the sexual assault, which were the same shoes the defendant was seen wearing in hospital surveillance video on the night he left the hospital. The detectives told the defendant this man was seen peeping into a window near Y.W.'s apartment complex. The defendant admitted he was around Y.W.'s apartment complex visiting a friend, while denying that he looked in a window. When the defendant arrived, he parked behind the white house, located at 910 South Vine Street. He then walked north on Vine Street, east on Washington Street, and eventually arrived at Fairlawn Street, which he walked along until he reached Hollywood Boulevard, where he met his friend.

¶ 29    The defendant stated he was being falsely accused of rape. Throughout the interview, the defendant told the detectives that he did not want to cooperate, that he wanted to take the accusations to the next level, that he wanted to protect his rights, and that the detectives were oppressing him. When the detectives denied violating his rights, the defendant said, "And I'm sitting here and steadily saying I'm being violated—I'm in cuffs."

¶ 30    Detective Sprague asked again for a buccal swab and told the defendant that a judge could order him to stay in jail if he did not comply. The defendant declined and accused the detective of violating his rights. Detective McCartney told the defendant that he was wearing a condom, and the defendant said that he did not wear condoms due to a latex allergy.

10

¶ 31    The edited video cut to Detective Sprague claiming that the defendant was at Y.W.'s place and "succumb[ed] to [his] sexual needs only once." Then, Detective Sprague stated that the defendant was at her place twice that evening and the defendant asked, "You say, wait a minute, hold on you said I left and came back that night?" Detective Sprague asked the defendant what he did after he left her place, and the defendant replied that he went home to change clothes before going to the hospital. Later, the detectives asked the defendant what he did with the gun. The defendant denied ever pointing a gun at anyone. He later said, "You know the whole thing this me confessing and talking to her about what she accused me to do. I want to clear that in the air, ok? That, that's all right as me and her to do." Detective McCartney asked the defendant to express remorse, and the defendant replied, "I don't even know if I did what you say I did. You were trying to say that I broke in somebody's house that ain't coming in my—I'm already arguing with him about the shoes." The defendant stated that he did not remember being in anyone's room. Detective McCartney repeatedly asked the defendant whether he was in Y.W.'s room, and he refused to answer. He denied he was at the scene.

¶ 32    Pursuant to a stipulation, the State introduced and published videos from the hospital, a Champaign-Urbana Mass Transit bus, and a home surveillance system camera. The hospital video showed the defendant present at the hospital at approximately 7:08 p.m. and 9:42 p.m. on July 7, 2021. The hospital video also showed the defendant returning to the hospital on July 8, 2021, at 3:24 a.m. Video from a bus parked near Y.W.'s apartment complex from between 10:40 p.m. and 10:43 p.m. on July 7 showed the defendant wearing black shoes. A neighbor's home surveillance video showed the apartment complex's courtyard including Y.W.'s back porch. A dark figure could be seen on video approaching Y.W.'s porch at 10:41 p.m. before leaving. The video also showed a man, in a black silhouette, entering her porch area around 1:34 a.m. and leaving around

11

2:08 a.m. Detective Sprague opined that the man on the video had the "same unique swagger" as the defendant. The Urbana Police Department received the 911 call at 2:12 a.m.

¶ 33    Pursuant to a stipulation and testimony, the jury learned that on July 16, 2021, Detective Sprague seized an iPhone Plus from the defendant, and the phone was given to the Decatur Police Department to perform a file extraction. The Decatur police downloaded the phone's content and placed the content on an external hard drive for Urbana police. The phone's content was uploaded to the Urbana police's evidence storage network.

¶ 34    Detective Tim McNaught used the Cellebrite forensic program to extract and analyze the defendant's iPhone information and sent the data to Detective Sprague. People's Exhibit 23 was a flash drive containing the extracted information which showed a listing of the significant location visits derived from defendant's cell phone. Using the phone's extracted data, the State presented an area map with pushpins that showed the phone's location near Y.W.'s apartment at approximately 10:41 p.m. on July 7, 2021, and later between 1:34 a.m. and 2:10 a.m. on July 8. Detective Sprague testified that the phone's location data coordinated with times the surveillance videos showed someone on Y.W.'s porch. Another map bearing a timestamp of 10:41 p.m. on July 7, 2021, coordinated with the surveillance video of a male on his cellphone walking in the courtyard. People's Exhibit 22, which was admitted into evidence, depicted a map of Y.W.'s residence, including her garage and porch, in relation to the white house and brown apartments on Vine Street where the defendant stated his friends lived.

¶ 35    Detective McNaught viewed the iPhone's KnowledgeC database, which tracks the phone's activities including user-initiated activity. The KnowledgeC database showed no user-initiated activity from 1:40 a.m. to 2:02 a.m. The State presented text messages from 9:55 p.m., in which the phone's user sent a message to "Kay Kay" that stated he was "pulling up." Kay Kay replied

12

with his address on South Vine Street. At 10:39 p.m., the phone's user sent a message that said, "I'm out here by the bus."

¶ 36    The State introduced a February 2, 2020, photo of a Glock from the defendant's phone. The State also introduced a July 2, 2021, text message that was sent to the phone that stated "what is the pipe situation?" and the phone's user replied that the user was waiting for a pipe.

¶ 37    During cross-examination, Detective Sprague testified that neither a gun nor ammunition was found in the defendant's residence or truck. However, drugs were found in a shoebox in the defendant's home. Sprague found inositol, which is a common cutting agent for heroin. During the defendant's arrest, police found $1,340 on his person.

¶ 38                              B. The Defendant's Case

¶ 39    Hooper, Y.W.'s neighbor, testified on behalf of the defense. Hooper saw a suspicious man hanging out in the neighborhood on multiple occasions in the weeks before July 8, 2021. The man asked Hooper for money on several occasions. Hooper recalled that his car had been broken into by a man who looked like the man asking for money. Other vehicles in the neighborhood had been broken into before July 8. Hooper once saw the man standing outside of a grocery store in Urbana. Hooper described the man as a heavyset black male with a short hairstyle, between 42 and 50 years old.

¶ 40    On July 8, 2021, Hooper saw a photographic lineup that contained the defendant's photo and five other men. Hooper selected Blissit's photo as the man he saw in the neighborhood prior to July 8, 2021. Hooper did not see Blissit on July 8. On cross-examination, Hooper said he had never seen the man that was to the left side of the assistant state's attorney.

13

¶ 41                           C. Closing Arguments

¶ 42    During closing arguments, the State argued that the police were not required to interview Blissit. The State discussed the charges against the defendant, the defendant's police interviews, the sleep app recordings, the shoeprint evidence, the Air Force 1 shoes, the surveillance videos, the text messages from the defendant's phone, the phone's user-activity log and location data, and his refusals to provide a buccal swab.

¶ 43    Defense counsel argued to the jury that the State failed to meet its evidentiary burden because there was no direct evidence that the defendant was in Y.W.'s apartment. Defense counsel pointed out that Y.W. did not see the defendant or a gun, that no gun had been found in his apartment, and the sleep app recordings were unreliable. Defense counsel argued that neither the DNA nor the footprint evidence were conclusive and disputed the idea that the defendant had confessed.

¶ 44    The State argued in rebuttal that the evidence supported the conclusion that the defendant committed the charges. The jury found the defendant not guilty of aggravated criminal sexual assault with a firearm while finding him guilty of aggravated criminal sexual assault with a dangerous weapon and aggravated criminal sexual abuse.

¶ 45                    D. Posttrial Proceedings and Sentencing

¶ 46    Following the trial, on May 31, 2023, the defendant mailed a *pro se* motion alleging ineffective assistance of counsel and that the State withheld evidence. The defendant wrote that he did not want counsel to represent him and that he wanted to proceed *pro se*. On June 12, 2023, defense counsel filed a motion for acquittal, or in the alternative, motion for new trial. On June 26, 2023, the defendant filed a *pro se* discovery motion.

14

¶ 47    At the motion hearing, the trial court conducted a colloquy with the defendant and defense counsel regarding the defendant's claim of ineffective assistance of counsel. The trial court found defense counsel had performed reasonably. The trial court then allowed the defendant to represent himself after the trial court advised the defendant of his right to counsel, the disadvantage of losing counsel, and the possible sentence he was facing. The trial court informed the defendant that he would represent himself in all posttrial motions and then at the sentencing hearing. The trial court found the defendant knowingly, intelligently, and voluntarily waived his right to counsel after providing admonishments. The trial court informed the defendant that defense counsel had filed a posttrial motion, and the defendant said that he wanted to file his own motion.

¶ 48    During the next six months, the defendant was granted multiple continuances to file a posttrial motion as he waited for the State to provide various materials. On December 13, 2023, the trial court warned the defendant that despite delays from the State, he needed to file a posttrial motion by January 3, 2024. The defendant filed an "Objection to Jurisdiction Pursuant to 735 ILCS 5/2-301(a)" and motion to dismiss with prejudice pursuant to section 2-619(a)(1) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(1) (West 2022)) and an affidavit of fact. The defendant "objected to jurisdiction" by arguing that he did not consent to it and faced false charges. The defendant argued that evidence from the sexual assault kit "cleared" him and there was insufficient evidence that he committed the sexual assault. He argued that Detective Sprague arrested him on false charges, fabricated evidence, and cannot serve as a witness. Before sentencing on January 4, 2024, the trial court deemed the affidavit and objection as the defendant's posttrial motion. The trial court asked the defendant whether he wanted to add anything to the document and he replied, "No." The trial court listened to arguments and denied the defendant's posttrial motion.

15

¶ 49 At sentencing, the State's aggravation evidence consisted of Detective Sprague and Detective Richard Coleman testifying about other alleged crimes. Detective Sprague first testified that a search of the defendant's home and vehicle on July 16, 2021, uncovered methamphetamine, heroin, and other drug paraphernalia. Over the defendant's objections, Detective Sprague testified that he received a police report from Panama City, Florida, that alleged the defendant had engaged in illegal sexual activities with a 16-year-old girl in Illinois before taking her to Florida, where he trafficked her as a prostitute. The defendant objected that Detective Sprague's testimony was hearsay and not relevant. The trial court overruled the objection. On cross-examination, Detective Sprague stated that he was "just stating facts from Panama City Police Reports." Detective Sprague testified that "he had no reason to doubt that they are lying in their reports."

¶ 50 Detective Coleman testified that the defendant was suspected of touching numerous women's buttocks in Urbana from 2019 to 2020. A woman described a heavy-set black male, six feet tall, with dreadlocks. The defendant became a suspect based on a picture of his truck and license plate. Detective Coleman testified that the defendant, during an interview with Detective Sprague, admitted to at least one inappropriate touching incident. The State argued for the full maximum sentence of 54 years in prison by relying on the facts of the current case and by arguing the defendant had a history of sexual misconduct. The defendant declined to make a mitigation argument. The trial court stated it reviewed the defendant's background which showed that he had five children and suffered from PTSD.

¶ 51 The trial court found substantial aggravation evidence including evidence regarding the pending drug case and evidence of the defendant allegedly touching women's buttocks. The trial court made the following finding regarding evidence related to the Florida case:

16

"THE COURT: I also heard and I find this quite troubling, about the incident that he had here in Illinois with Mr. Johnson and this young woman, pressuring her in whatever way he could to perform sex acts here, and then travel down to Florida where he continued to essentially pimp her out, listing her on the Dark Web, and on social media to sell her out. Again a sex offense, a minor involved, I do think it's relevant and reliable for the court.

What I'm starting to see here is a pattern of [the defendant] of engaging in sex acts against the will of other individuals, and it's been occurring over time."

¶ 52    The trial court sentenced the defendant to 35 years for aggravated criminal assault with a dangerous weapon plus an MSR term of 3 years and credit for 902 days, consecutive to a sentence of 10 years for aggravated criminal sexual abuse. The defendant did not file a motion to reconsider the sentence. The defendant filed a timely notice of appeal.

¶ 53                                    II. ANALYSIS

¶ 54                        A. Ineffective Assistance of Counsel Claims

¶ 55    The defendant contends he received ineffective assistance of counsel prior to and during the trial. He maintains that any one of defense counsel's errors was serious enough to prejudice him, but their cumulative effect undermined confidence in the outcome of the trial. Accordingly, he argues this court should reverse his convictions and remand the matter for a new trial.

¶ 56    A defendant's right to effective assistance of counsel is a fundamental constitutional right, U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim of ineffective assistance of counsel, "a defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61. To establish counsel's

17

deficient performance, a defendant must show that "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14 (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, a defendant must show that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004) (citing *Strickland*, 466 U.S. at 694). "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. Whether counsel was ineffective is a mixed question of fact and law. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 222. "[T]he ultimate question of whether counsel's actions support a claim of ineffective assistance is a question of law that is subject to *de novo* review on appeal." *Id.*

¶ 57   The defendant first contends that defense counsel's performance was deficient and that he was prejudiced by the deficiency where defense counsel failed to move to suppress his custodial statements in violation of his fifth amendment right to silence. The defendant asserts that throughout the police interview, he unequivocally invoked his right to silence, but the detectives did not honor his right and continued to question him.

¶ 58   Defense counsel's decision "to file a motion to suppress is generally a matter of trial strategy and not subject to a claim of ineffective assistance of counsel." *People v. Brickhouse*, 2018 IL App (3d) 150807, ¶ 40. "In order to establish prejudice resulting from defense counsel's failure to file a motion to suppress, a defendant must show a reasonable probability that (1) the motion to suppress would have been granted and (2) the outcome of the trial would have been different had the evidence been suppressed." *Id.* Here, the defendant argues, the motion to suppress was meritorious and the outcome of his trial would have been different had his statements from the July 16, 2021, video been suppressed.

¶ 59　The United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 471 (1966), held that before an accused can be subject to custodial interrogation, he must be advised of his rights including the right to remain silent, the right to consult with an attorney, and the right to have an attorney present with him during interrogation. The United States and Illinois Constitutions provide that no person shall be compelled to be a witness against himself in any criminal case. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. Even where a suspect initially waives his rights and agrees to talk to police, the interrogation must cease if he indicates "in any manner" prior to or during questioning that he wishes to remain silent. *Miranda*, 384 U.S. at 444-45. The invocation of the right to remain silent, however, must be unambiguous and unequivocal. *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). "This right to silence may be invoked either verbally or through conduct that clearly indicates a desire to end all questioning." *People v. Diaz*, 377 Ill. App. 3d 339, 347 (2007). "If verbal, the individual's demand to end the interrogation must be specific." *Id.* In the case of a nonverbal invocation, the Illinois Supreme Court has held that a defendant had invoked his right to remain silent when he placed his hands over his ears, turned his head, and chanted " 'nah nah nah.' " *People v. Nielson*, 187 Ill. 2d 271, 287 (1999). The defendant's statement cannot be evaluated in isolation, but "must be examined in the factual context of its utterance." *People v. Milner*, 123 Ill. App. 3d 656, 660 (1984).

¶ 60　Whether an alleged invocation is unambiguous and unequivocal is dependent on how a reasonable officer would perceive the defendant's words. *Davis*, 512 U.S. at 459. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to

counsel, our precedents do not require the cessation of questioning." (Emphasis in original.) *Id.*[3] However, once a defendant unambiguously and unequivocally invokes his right to remain silent, police must scrupulously honor the defendant's invocation of his right; if they fail to do so, any statement obtained as a result must be suppressed. *People v. Reichert*, 2023 IL App (5th) 180537, ¶ 87. "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474.

¶ 61    Here, the detective provided *Miranda* warnings to the defendant before the interview. The defendant contends that after the interview began, he repeatedly invoked his right to remain silent through his verbal statements, nonverbal body language, and expressed hostility. He further contends that he expressed his desire to end questioning by refusing to cooperate with the detectives' requests. The defendant maintains he communicated his desire to not cooperate with the detectives' investigation when he refused to comply with a DNA swab order, stating:

> "I'm not trying to partake in none of that that y'all got going on. I'm not on that—
> Y'all are just violating my rights were oppressing me with things that y'all got going on
> and whatever you said, OK, then we need to go to the next step, bro, cause I am not
> cooperating when you say we signing. No, I'm not doing no fingerprinting in the county.
> I'm not doing nothing to do with your corporation [*sic*], bro."

¶ 62    To support the argument that he invoked his right to remain silent, the defendant cites *People v. Ward*, 2023 IL App (1st) 190364. In *Ward*, the defendant asserted that he had invoked his right to silence during custodial interrogation on three occasions when he stated: "I ain't got nothin' else to say"; "[g]ot nothin' to say"; and "don't want to say nothing else about it." *Id.* ¶ 102.

---

[3]"Although *Davis* concerns the right to counsel, the standards that apply when determining whether defendant invoked his right to counsel are the same as when determining whether defendant invoked his right to remain silent." *People v. Reichert*, 2023 IL App (5th) 180537 n.1 (citing *Berghuis*, 560 U.S. at 381).

After each of the three times the defendant in *Ward* alleged that he invoked his right to silence, the detectives took a break but then eventually resumed questioning him. *Id.* After being held for approximately 12 hours, the defendant ultimately made several inculpatory statements to a second team of detectives. *Id.* Defense counsel challenged the statements in a motion to suppress, but the trial court denied the motion and permitted the prosecution to use the statements at trial. *Id.* ¶¶ 65-66. Reviewing *de novo*, the First District reversed and remanded, finding that the defendant's invocations of his right to silence were clear and unequivocal; that the State had not attempted to argue that the police scrupulously honored the invocations; and that the error was not harmless beyond a reasonable doubt. *Id.* ¶¶ 120-24.

¶ 63     The defendant implies that the invocations in *Ward* were so similar to his statements that we are compelled to find his statements to be unequivocal invocations of his right to silence. We decline the defendant's invitation to examine his statements in isolation by comparing them to those made in *Ward*. Rather, viewing the defendant's videotaped statements in the context of the entirety of the custodial interrogation, we do not find that the defendant unambiguously and unequivocally invoked his right to silence such that a reasonable officer would perceive the defendant's words as a desire to end all questioning. *Davis*, 512 U.S. at 459. Here, the defendant's refusal to comply with the DNA swab order and a refusal to submit to fingerprinting fell short of a clear and unambiguous demand to end the interrogation. Although he expressed a desire not to cooperate, he continued to speak about Y.W.'s allegations, to offer denials, and to answer questions about his movements on the night of the sexual assault.

¶ 64     The defendant next maintains that he explained to the officers that he wanted to invoke his rights, including his right to go to trial and face his accuser, when he stated:

21

"Bro. I'm not playing about why I'm over there and y'all got me. I—that ain't got nothing to do. I don't know what you're talking about. Somebody accused me of and hired y'all the—the agents to enforce the law on me about what she saying she accused. Well, I got the right to face my accuser. I got the right to go to trial and be found guilty. If that's what ya'll are saying that to have that, that what we can do, we need to focus on that. We need to handle that because you, I know."

¶ 65    While these statements indicate the defendant was invoking his right to trial and right to face his accuser, they were not a clear and unequivocal invocation of his right to remain silent. The defendant next argues that he repeatedly told the detectives that he was not giving consent for any of the detectives' actions:

"No, no, I don't really care what, you know, bro, you trying to charge me for stuff, I'm trying to defend what I got going on. I'm not even giving, you consent, on nothing. You right now are violating my right and doing everything your own, on. It's not me giving you consent."

¶ 66    Further, when Detective Sprague warned him that they would examine his phone, the defendant responded, "I'm not giving you consent." He maintains that the statement, in context, meant he did not give consent to the continued questioning. He informed the officers that he did not want "to do business with them." He asserts that despite his repeated invocations of his constitutional right to end questioning and proceed via judicial channels, the detectives continued questioning him.

¶ 67    The issue before us is whether a reasonable officer under the circumstances would have understood the defendant's statements as an unequivocal invocation of his right to silence. See *Davis*, 512 U.S. at 459. Here, the defendant's statements, taken in context, did not clearly and

22

unambiguously indicate that he no longer wanted to speak to the detectives. Rather, he was denying consent to specific action by the detectives (*i.e.*, the defendant did not consent to the detectives examining his phone).

¶ 68 Finally, the defendant maintains he asserted his right to silence in response to Detective McCartney's question as to whether the defendant had sex that night, to which the defendant replied:

"That ain't got nothing to do with what I'm talking about, bro. You oppressing me. I don't have to answer that question just like you didn't have to answer that question."

¶ 69 Here, the defendant's refusal to answer a specific question was not a request to end the detective's questioning. Accordingly, as we find that none of the defendant's custodial statements were unambiguous and unequivocal invocations of his right to remain silent, we do not find that defense counsel's failure to move for the suppression of the defendant's statements was deficient performance. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005) ("failure to file a motion to suppress does not establish incompetent representation when the motion would have been futile").

¶ 70 The defendant next claims ineffective assistance where defense counsel failed to move to suppress or exclude his refusals to provide a buccal swab in violation of his fourth amendment right to refuse a pre-warrant request for a buccal swab and in violation of his due process right to challenge an *ex parte* buccal swab order after notice and opportunity to be heard. Specifically, the defendant maintains that the State, without objection by defense counsel, introduced two videos of him declining three separate attempts by detectives to administer a DNA swab outside the presence of defense counsel. The defendant first declined Detective Sprague's July 10, 2021, pre-arrest request for a buccal swab. The second and third refusals occurred on July 16, 2021, during

23

the custodial interview when the defendant refused to provide a buccal swab after the detectives showed him what the defendant characterizes as an "*ex parte* court warrant order."

¶ 71 The State counters that the defendant cannot establish prejudice. The State argues that even without evidence of the defendant's refusals to provide a buccal swab, there was sufficient evidence of his guilt admitted at trial when considering the surveillance videos, analytics of the defendant's cell phone, and the mapping of his location relevant to the time of the sexual assault.

¶ 72 "[A] defendant's failure to make the required showing of either deficient performance or sufficient prejudice will defeat a claim that counsel was ineffective." *People v. Johnson*, 2021 IL 126291, ¶ 53. "As a result, if it is easier to dispose of an ineffective-assistance claim on the ground that it lacks a showing of sufficient prejudice, a court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient." *Id.* Assuming, *arguendo*, defense counsel's performance was deficient, this court will "consider the totality of the evidence before the finder of fact" in order to weigh the impact of those errors. *People v. McCarter*, 385 Ill. App. 3d 919, 936 (2008) (citing *Strickland*, 466 U.S. at 695). "That is, instead of viewing the improper evidence in isolation, the reviewing court must look to the ramifications the improper evidence might have had on the factfinder's overall picture of events." *Id.* (citing *Strickland*, 466 U.S. at 695-96).

¶ 73 Considering the totality of the evidence presented at trial, we find the defendant cannot establish the prejudice prong of *Strickland* for defense counsel's failure to move to suppress or exclude his refusals to provide a buccal swab. Hospital surveillance video showed the defendant present at the hospital at approximately 7:08 p.m. and 9:42 p.m. on July 7, 2021, but he did not return to the hospital until 3:24 a.m. on July 8, 2021. Video evidence from a mass transit bus showed a man in the courtyard of Y.W.'s apartment complex wearing Air Force 1 shoes at

24

approximately 10:40 p.m. on the night of the sexual assault, which were the same shoes the defendant was seen wearing in hospital surveillance video on the night he left the hospital. The defendant's text messages to Kay Kay reveal the defendant was near Y.W.'s apartment at 10:39 p.m. that night. A neighbor's home surveillance video showed the apartment complex's courtyard, including Y.W.'s back porch, where a dark figure could be seen approaching Y.W.'s porch at 10:41 p.m. before leaving. The video also showed a man, in black silhouette, entering her porch area around 1:34 a.m. and leaving around 2:08 a.m. Detective Sprague opined that the man on the video had the "same unique swagger" as the defendant.

¶ 74 Although the defendant admitted to being in the area near Y.W.'s apartment on the night of July 7, he denied returning to the area in the early morning hours of July 8. However, video surveillance and cell phone extraction data revealed that was not true. In addition to showing the defendant was near Y.W.'s apartment at 10:41 p.m. on July 7, the defendant's cell phone extraction data showed the defendant near her apartment again between 1:34 a.m. and 2:10 a.m. on July 8, 2021. Additionally, the defendant's phone showed no user-initiated activity from 1:40 a.m. to 2:02 a.m. on July 8, 2021. The Urbana Police Department received the 911 call of the sexual assault at 2:12 a.m. The jury heard the two 10-second audio clips from Y.W.'s sleep app on the night of the sexual assault of a man threatening to shoot her if she did not comply. They also heard Detective Sprague identify the voice as belonging to the defendant.

¶ 75 When the officers searched the defendant's residence, they found a pair of black Air Force 1 shoes in size 11, which were consistent with the shoeprints found in Y.W.'s bedroom on the night of the sexual assault. Although the shoe print analysis was inconclusive, it is clear that the defendant lied when he told the detectives he wore a size 10 shoe. Finally, towards the end of the July 16, 2021, interview, in response to Detective Sprague's question as to what the defendant did

after he left Y.W.'s place, he did not deny that he had been to her residence; instead, he replied that he went home to change clothes before returning to the hospital.

¶ 76 We note that the prejudice prong of *Strickland* requires a showing of "actual prejudice, not simply speculation that defendant may have been prejudiced." (Internal quotation marks omitted.) *Johnson*, 2021 IL 126291, ¶ 55. Accordingly, we conclude the defendant was not prejudiced by defense counsel's failure to move to suppress or exclude his refusal to provide a buccal swab where there is no reasonable probability that the result of the proceedings would have been different had the evidence been excluded.

¶ 77                                    B. Improper Closing Arguments Claims

¶ 78 The defendant contends that during closing and rebuttal arguments, the State used the defendant's exercise of his right to decline a buccal swab against him, improperly vouched for the credibility and authority of the police and the state's attorney's office, utilized sarcasm to diminish his defense, and implied there was evidence against him that was not presented. The defendant concedes he did not object to the State's comments during closing argument or raise the issues in a posttrial motion; nevertheless, he maintains that review and relief are warranted under either prong of the plain error doctrine or, alternatively, as a claim of ineffective assistance of trial counsel for failing to preserve the error.

¶ 79 "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48. "Failure to do either results in forfeiture." *Id.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Under either prong, the burden of persuasion remains with the defendant. *People v. Rodriguez*, 2014 IL App (2d) 130148, ¶ 73.

26

¶ 80    To establish first-prong plain error, a defendant must prove there was a plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 53. To determine whether the evidence was closely balanced, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of the evidence within the context of the case." *Id.* (citing *Sebby*, 2017 IL 119445, ¶ 53). "If the defendant meets his burden, he has demonstrated actual prejudice and his conviction should be reversed." *Id.*

¶ 81    To establish second-prong plain error, a defendant must prove that a structural error occurred. *Id.* ¶ 54. A structural error, which occurs in very limited circumstances, is defined as one that renders a criminal trial fundamentally unfair or unreliable in determining a defendant's guilt or innocence. *Id.* Examples of such errors are a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, or a defective reasonable doubt instruction. *Id.*

¶ 82    When a defendant fails to establish plain error, the result is that his procedural default must be honored. *People v. Jackson*, 2020 IL 124112, ¶ 81. Whether plain error exists is a question of law reviewed *de novo*. *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009). "The first step in plain error review is to determine whether a clear or obvious error occurred." *People v. Finlaw*, 2023 IL App (4th) 220797, ¶ 47.

¶ 83              1. *Defendant's Pre-Warrant Refusal of Buccal Swab*

¶ 84    The defendant contends that the State improperly introduced evidence of his July 10, 2021, refusal to submit to a DNA swab and later relied upon his refusal in closing arguments. In support of his contention, the defendant cites *People v. Ealy*, 2015 IL App (2d) 131106. In *Ealy*, the defendant was convicted of the first degree murder of a coworker. *Id.* ¶ 5. The trial court admitted

27

evidence that the defendant had refused DNA testing by police while other coworkers had consented. *Id.* ¶ 30. The police had not yet obtained a warrant for the DNA testing at the time of the defendant's refusal. *Id.* ¶ 13. At trial, the State argued to the jury that the defendant's refusal to submit to DNA testing evinced a consciousness of guilt and emphasized that every other coworker had voluntarily provided a DNA sample. *Id.* ¶ 35. The *Ealy* court concluded that the trial court had abused its discretion in admitting evidence of the refusal. *Id.* ¶ 65. Moreover, the court found, "[t]he State may not introduce evidence that the accused exercised his constitutional right to be free from unreasonable searches and seizures, because the prejudicial effect substantially outweighs the probative value of allowing the jury to infer the accused's consciousness of guilt from his exercise of his rights." *Id.* ¶ 51.

¶ 85 Here, similar to *Ealy*, the detectives had not yet obtained a warrant for the DNA testing at the time of the defendant's refusal. Thus, we find error where the State introduced evidence of the defendant's pre-warrant refusal. However, evaluating the error in the context of the case, it does not rise to the level of first-prong plain error where the evidence was not so closely balanced that the error alone severely threatened to tip the scales of justice. *Sebby*, 2017 IL 119445, ¶ 51. The combination of the DNA inclusion, surveillance videos, location data extracted from the defendant's cell phone, the phone's user-activity log, the sleep app recordings, the shoeprint evidence, and the Air Force 1 shoes provided substantial support for the verdict.

¶ 86 The defendant next argues that the State's improper comments were meant to overcome the deficiencies in the police investigation. The defendant maintains that the evidence was closely balanced because the State's evidence did not completely rule out Blissit or another individual as the assailant. He argues that despite the identification of Blissit as a suspicious person in the area, the State presented no evidence that DNA or other evidence ruled him out as a suspect. Nor, he

argues, did the State provide any evidence of analysis of Blissit's DNA, voice, cell phone records, or evidence that detectives even questioned him about the crime. The defendant's argument reveals a misapprehension of the State's burden. It is the State's burden to prove every element of an offense beyond a reasonable doubt. *People v. Crane*, 2020 IL App (3d) 170386, ¶ 29. The defendant cites no authority to support his proposition that the State has the burden to completely rule out any other possible suspects.

¶ 87                    2. *Defendant's Post-Warrant Refusal of Buccal Swab*

¶ 88    The defendant next argues that he had a due process right to contest what he describes as a "non-emergency *ex parte* buccal swab order" via a hearing or to wait for the commencement of adversarial court proceedings to allow a buccal swab in the presence of counsel. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2; Ill. S. Ct. R. 413(b) (eff. July 1, 1982). He contends that, consistent with due process requirements, Illinois statutory law generally requires formal charges and a probable cause hearing with the defendant and his counsel before a court may issue a buccal swab discovery order. 730 ILCS 5/5-4-3(a-3.2) (West 2022) (providing that a judge may order a buccal swab after a grand jury indictment or after a probable cause hearing in which the defendant and counsel are present). The defendant maintains that he refused to submit to the buccal swab on July 16, 2021, because he was exercising his due process right to receive notice and be heard on the "*ex parte* order."

¶ 89    We find the defendant's argument without merit. The buccal swab order at issue was not obtained pursuant to Illinois Supreme Court Rule 413. As the State correctly notes, the buccal swab order at issue here was entered as part of a search warrant sought and obtained by police prior to their interview with the defendant on July 16, 2021. Detective Sprague testified that he had obtained a search warrant for defendant's truck and residence, as well as a warrant signed by

29

the judge to obtain a DNA sample or buccal swab. At the preliminary hearing, it was reaffirmed, without objection, that the defendant had been ordered to submit his DNA as part of the search warrant. It was this warrant that police were referencing in the video in their effort to obtain the buccal swab refused by the defendant. Contrary to his claim, the defendant was not exercising his rights when he refused to submit to the buccal swab on July 16, 2021. Because the defendant had neither a constitutional nor statutory right to refuse a lawfully issued search warrant, there is no error to establish plain error. For the same reason, the defendant's alternative argument that counsel was ineffective for failing to preserve the issue fails.

¶ 90        3. *Improper Vouching and Alluding to Evidence Outside of Trial Claims*

¶ 91    The defendant contends that the prosecutor emphasized the State's expertise and authority, vouched for Detective Sprague's testimony and investigation, and expressed her personal opinion to imply that the police and state's attorney office would not investigate or prosecute anyone based on flimsy evidence.

¶ 92    A defendant seeking reversal of his conviction based upon improper remarks made during closing argument faces a difficult burden. *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 48. During closing argument, the prosecution may comment on the evidence presented, reasonable inferences from that evidence, and the credibility of the witnesses. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. "It is well established that prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant." *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994). "Substantial prejudice occurs if the improper remarks constituted a material factor in the defendant's conviction." *People v. Johnson*, 2023 IL App (5th) 190426-B, ¶ 35. An improper remark constitutes a material factor where the jury could have reached a contrary verdict had the improper remark not been made or where a

30

reviewing court cannot say that the prosecutor's improper remark did not contribute to the defendant's conviction. *Id.* "This standard is similar to the standard applied in plain error analysis." *Id.* (citing *Jackson*, 2020 IL 124112, ¶ 83). Closing arguments are viewed in their entirety, and the challenged remarks must be considered in context "rather than focusing on selected phrases or remarks." *People v. Runge*, 234 Ill. 2d 68, 142 (2009); *Holmon*, 2019 IL App (5th) 160207, ¶ 51.

¶ 93    Nevertheless, it is improper for a prosecutor to personally vouch for the credibility of a witness or to bolster a witness's testimony. *Johnson*, 2023 IL App (5th) 190426-B, ¶ 33. A prosecutor may not invoke the integrity of the state's attorney office to vouch for a witness's credibility. *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 66. Improper bolstering involves an expression of a prosecutor's personal belief in the credibility of a witness. See *People v. Rogers*, 172 Ill. App. 3d 471, 476 (1988). In determining whether comments made during closing argument were proper, a reviewing court must examine the closing argument in its entirety and view the complained-of remarks in context. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. Thus, to provide the context for our review, we set out a significant portion of closing arguments and rebuttal below.

¶ 94    In closing argument, defense counsel argued that Detective Sprague "totally brushed" off Hooper's testimony implicating Blissit. Specifically, defense counsel stated:

> "Detective Sprague made it sound when he testified as if a six-pack lineup really doesn't mean anything. Well, if [the defendant's] picture had been picked out of that lineup, I bet it would mean a whole lot different, and his response to that would be a whole lot different."

¶ 95    In response, the State argued that Hooper's identification of Blissit did not mean that police were required to investigate Blissit:

31

"Again, did the witness—did Mr. Hopper [*sic*] see Mr. Blissit around the neighborhood? I don't know, perhaps he did, but he didn't see him that day. And we know that the Defendant was also over there. We know that Mr. Hopper [*sic*] never saw the Defendant. So is it possible that there's two people over there? Sure. But, again, because Mr. Hopper [*sic*] sees we'll just assume Mr. Blissit over there trying to pull on car door handles, does that mean we need to go hook him up and question him on criminal sexual assault? This isn't the wild, wild west, ladies and gentlemen. We need to have some evidence. Some evidence that we have for this guy."

¶ 96 The defendant argues that the prosecutor's remark that "[t]his isn't the wild, wild west" was an attempt to suggest to the jury that neither the State nor the police would carelessly prosecute or investigate individuals. In essence, the defendant maintains, the prosecutor urged jurors to trust the government's judgment and used her own views to justify the detectives' decision not to attempt to rule out Blissit as a suspect. While it is true that "[p]rosecutors are not permitted to vouch for the credibility of a government witness nor are they permitted to use the credibility of the state's attorney's office to bolster a witness's testimony" (*People v. Williams*, 2015 IL App (1st) 122745, ¶ 12), that is not what occurred here. When viewed in context, the State was simply responding to defense counsel's argument by explaining that Hooper's identification of Blissit out of a lineup alone did not provide sufficient evidence to arrest him for sexual assault. We note that a prosecutor may respond to comments made by defense counsel that clearly invite a response. *People v. French*, 2017 IL App (1st) 141815, ¶ 48.

¶ 97 The defendant next argues that the prosecutor's rebuttal comments demonstrate the prosecutor was vouching for the police. As previously noted, a reviewing court must view the

complained-of remarks in context. *Burman*, 2013 IL App (2d) 110807, ¶ 25. In closing argument, defense counsel stated:

"I know this is a hard case. [Y.W.] came in and she said that somebody broke into her apartment and sexually assaulted her. We want to blame somebody for it. We want to hold somebody accountable. You might want to be inclined to convict [the defendant] because he's the one that's been charged with a crime. But you can't do that, and the instructions tell you that.

\*\*\*

You can't hand out a guilty verdict simply because you want someone to pay for what happened to [Y.W.]."

¶ 98    In rebuttal, the State argued:

"[Defense counsel] says that it's easy to blame [the defendant] because this is such a terrible case and you want to blame somebody. Because this is such a terrible case and because what happened to the victim is so terrible, that is why the Urbana Police Department spent so much time investigating it and making sure they had the correct person.

When they interviewed him on July 10th, they could have arrested him. They could have said, you know, we have a—we have a little bit of evidence right now. We think that it was you. They were looking at him. They could have just arrested him then. If that's the only thing they're trying to do was get somebody behind bars for this, get somebody convicted for it because the offense is so terrible, just arrest the Defendant on July 10th. Don't do all this fancy location information. Just arrest him. Because the case is so serious,

33

that is why the police department put so much effort and tools into proving that it's your Defendant."

¶ 99 Once again, we find the prosecutor's remarks were a response to defense counsel's argument suggesting that the police were simply looking for anyone to blame due to the seriousness of the charges. Because we find that the prosecutor did not improperly vouch for the police, we find no clear or obvious error; thus, plain error is inapplicable. Alternatively, the defendant argues that trial counsel was ineffective for failure to preserve the error. Because we find no error, we decline to consider defendant's claim of ineffective assistance of counsel. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 47.

¶ 100 The defendant's next claim of error is that the prosecutor's use of sarcasm "should not be discounted," arguing that a prosecutor has no justification for engaging in unprofessional sarcasm. *People v. Moss*, 205 Ill. 2d 139, 174-75 (2001) (McMorrow, J., specially concurring) (describing sarcasm as improper and unprofessional). In rebuttal, the prosecutor stated:

"There was argument that Mr. Blissit had the same description as the offender that [Y.W.] talked about. What description did the victim gave—give? It was a black guy who was fat with short hair. Well, that really narrows it down, doesn't it. Really narrows it down. ***

The defense wants to say that the six-pack, as she calls it, and that's—that's what it's called, but the six-pack is the be-all and end-all. I'm gonna flip her argument. If Mr. Hopper [*sic*] would have picked out [the defendant], would the six-pack be the be-all and end-all? Betcha it wouldn't."

¶ 101 The defendant insists that the prosecutor's comments, including that "Really narrows it down" and "Betcha it wouldn't," show a concerning level of sarcasm and ridicule of the defense's

34

arguments and the defendant's trial rights. We find the defendant's argument without merit where the prosecutor's remarks in rebuttal were invited by defense counsel's argument. *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 56 ("Statements [made in closing argument] will not be held improper if they were provoked or invited by the defense counsel's argument." (Internal quotation marks omitted.)). The record reveals it was the defendant's trial strategy to point to Blisset as the attacker, and in closing argument, the defendant emphasized the importance of Blisset being identified in the lineup. In light of these arguments, the State responded by "flipping" the defendant's argument. Accordingly, we find no clear or obvious error.

¶ 102　The defendant contends that the following comments made by the prosecutor imply that the State only prosecutes strong cases and further demonstrate the prosecutor vouching for the police. In closing argument, the State argued that because the defendant committed sexual assault "that's why he sits here before you charged with two counts of aggravated criminal assault and one count of aggravated criminal sexual abuse." The State argued that the defendant's refusals to provide DNA was proof that "he knew what the results were going to be." Regarding the DNA evidence, the prosecutor stated:

> "If the DNA numbers were the only thing the police had, he wouldn't be sitting there. The DNA numbers do not exclude him. They include him in the group of people that could have sexually assaulted the victim. When you put that together with everything else, it's just one piece of the puzzle, ladies and gentlemen.
>
> *** I'm not asking you to hang your hat on the DNA. I'm saying that is one more piece of the puzzle, the puzzle that has a lot of pieces, ladies and gentlemen."

¶ 103　The defendant claims that the prosecutor gave a personal assurance that the police conducted a thorough investigation and were not just trying to "get somebody behind bars for this."

35

We disagree with the defendant's interpretation of the prosecutor's statements. Here, the prosecutor was explaining that the DNA evidence alone was not conclusive evidence of the defendant's guilt but, rather, was one piece of a larger puzzle which included the sleep app recordings, the shoeprint evidence, the Air Force 1 shoes, the surveillance videos, the text messages from the defendant's phone, and the phone's user-activity log and location data.

¶ 104   We find the defendant's argument unavailing. The prosecutor's remarks were not improper because they were reasonable inferences from the evidence at trial. Thus, because we find no "clear or obvious error" occurred, plain error review is in inapplicable. *Finlaw*, 2023 IL App (4th) 220797, ¶ 47.

¶ 105   Finally, the defendant contends that the prosecutor violated a pretrial motion *in limine* by personally vouching, without support from the trial evidence, that the police could have arrested the defendant on July 10, 2021. While a prosecutor may argue facts and legitimate inferences drawn from the evidence presented, it is improper for a prosecutor to argue assumptions or facts not based upon the evidence in the record. *People v. Williams*, 2023 IL App (1st) 192463, ¶ 134.

¶ 106   Prior to trial, the State agreed it would not introduce evidence that the defendant became a suspect based on allegations that he was suspected of touching numerous women's buttocks. While the defendant contends that the prosecutor's comment that the defendant could have been arrested on July 10, 2021, alluded to possible evidence outside of trial such as the allegations of inappropriate touching, he fails to make an argument. "The well-established rule is that mere contentions, without argument or citation of authority, do not merit consideration on appeal." *People v. Hood*, 210 Ill. App. 3d 743, 746 (1991).

¶ 107   Finally, the defendant argues that the cumulative effect of the errors deprived him of a fair trial. Having found no clear or obvious errors, we find the defendant's claim of cumulative error unavailing. *People v. Johnson*, 2023 IL App (4th) 210662, ¶ 90.

¶ 108            C. Consideration of Improper Evidence During Sentencing Claim

¶ 109   The defendant concedes that he forfeited his sentencing issue but nevertheless argues that the trial court's improper consideration of unverified hearsay evidence during sentencing constituted first-prong plain error where the trial court improperly relied upon the unproven Florida accusations to sentence him well above the minimum sentence without overwhelming aggravation evidence. "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* at 545. "The first step in the plain error analysis is to determine whether a clear or obvious error occurred." *People v. Johnson*, 2024 IL 130191, ¶ 44.

¶ 110   Under the Illinois Constitution, all penalties must be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Clemons*, 2012 IL 107821, ¶ 29. The balancing process conducted at sentencing requires the sentencing judge to carefully consider all the factors in aggravation and mitigation, including the nature of the crime, protection of the public, deterrence and punishment, as well as the defendant's rehabilitative potential, age, social history, criminal background, and education. *People v. Jackson*, 357 Ill. App. 3d 313, 329 (2005); *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). A reviewing court must afford great deference to the

37

trial court's judgment regarding sentencing because the trial court, having observed the defendant and the proceedings, has a far better opportunity to consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *Id.*

¶ 111   Here, the sentencing range for aggravated criminal sexual assault with a dangerous weapon, a Class X felony, is not less than 6 years and not more than 30 years. 730 ILCS 5/5-4.5-25(a) (West 2022). The trial court sentenced the defendant to 35 years' imprisonment plus 3 years' MSR. Additionally, the trial court imposed a 10-year sentence, to be served consecutively, for the aggravated criminal sexual abuse conviction. An aggravated criminal sexual abuse violation "is a Class X felony for which 10 years shall be added to the term of imprisonment imposed by the court." 720 ILCS 5/11-1.30(d) (West 2022).

¶ 112   The defendant contends that the trial court placed significant weight upon the unproven Florida charges when sentencing him well above the statutory minimum. He further contends this is a close case because the State's aggravation evidence was not overwhelming, and he did not have a significant criminal history or prior convictions for violent sexual offenses.

¶ 113   "While evidence of past criminal conduct is often not admissible at trial, it is relevant information at sentencing." *People v. Jackson*, 149 Ill. 2d 540, 548 (1992). At sentencing, the trial court may consider previous convictions and evidence of criminal conduct for which a defendant has not been convicted. *Id.* However, evidence of such conduct "should be presented by witnesses who can be confronted and cross-examined, rather than by hearsay allegations in the presentence report, and the defendant should have the opportunity to rebut the testimony." *Id.* Here, Detective

38

Sprague recited the Florida allegations from a police report involving an investigation in which he did not participate. There were no witnesses with direct knowledge who testified regarding the Florida allegations, and no corroborating evidence was offered. Under these circumstances, the allegations lacked sufficient indicia of reliability to be considered in aggravation.

¶ 114   Furthermore, the trial court gave substantial weight to these allegations, describing them as "quite troubling," and relied on them to identify an asserted pattern of sexual misconduct. The remaining sentencing evidence was not overwhelming. The defendant did not have a significant criminal history or any prior convictions for violent sex offenses. Without the Florida allegations, the remaining aggravating factors—including prior nonsexual offenses and uncharged local conduct—did not necessarily justify the lengthy consecutive terms imposed. Because the court relied heavily on improper aggravation evidence, the sentencing hearing was rendered unfair. Accordingly, plain error occurred, and the defendant is entitled to a new sentencing hearing.

¶ 115                                    III. CONCLUSION

¶ 116   For the foregoing reasons, we affirm the defendant's convictions, vacate the sentence, and remand for a new sentencing hearing consistent with this order.


¶ 117   Affirmed in part and vacated in part; cause remanded.

39